# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| | ) Case No. 1:18CR00010 |
| v. | ) |
| | ) **OPINION AND ORDER** |
| | ) |
| **LOUIS GARDNER MacDOWELL,** | ) By: James P. Jones |
| | ) United States District Judge |
| Defendant. | ) |

*Zachary T. Lee and Lena L. Busscher, Assistant United States Attorneys, Abingdon, Virginia, for United States; Dennis H. Lee, Galumbeck & Kegley, Tazewell, Virginia, for Defendant.*

Defendant Louis Gardner MacDowell is charged with unlawful possession of firearms, explosives, and destructive devices. In advance of trial, he has moved to suppress items seized following a state search warrant executed at his residence, asserting, among other things, that the affidavit supporting the search warrant was based upon a prior unconstitutional search. After an evidentiary hearing and briefing by the parties, I will deny the motion for the reasons that follow.

I.

I make the following findings of fact, based upon the evidence presented at a hearing held on June 4, 2019. The basic facts are undisputed, but where there was a conflict in the testimonial evidence, I have taken into account the rationality and internal consistency of the testimony, the extent of detail and coherent nature of the

testimony, the manner of testifying by the witnesses, and the degree to which the subject testimony is consistent or inconsistent with other evidence in the case.

On January 7, 2018, Robert Baldridge, a Master Deputy with the Tazewell County Sheriff's Office, went to MacDowell's residence after receiving a call from MacDowell's mother, who had advised him that she had found narcotics and drug paraphernalia in the home. MacDowell's parents owned the home but lived in Florida. They allowed MacDowell to live there and visited him on occasion. McDowell lived alone in the house.

When Baldridge arrived at the residence, MacDowell's mother handed him a case with a syringe and a spoon in it and a plate with pills on it. MacDowell told Baldridge that the items did not belong to him. Baldridge asked for MacDowell's consent to search his bedroom, which MacDowell granted. In the bedroom, Baldridge found a syringe between the bed's mattress and box springs. While in the residence, Baldridge saw multiple firearms, including several long guns and a handgun, along with accessories for them. MacDowell told Baldridge that one of the firearms belonged to him. As a result of this encounter, Baldridge issued a summons to MacDowell for possession of drug paraphernalia, but it was not prosecuted.

On March 4, 2018, Baldridge received another call from MacDowell's mother. She told Baldridge that she believed her son was having "some kind of

psychotic break," Tr. 7, ECF No. 90, and that she was concerned for his safety. She also told Baldridge that she had contacted one of her son's neighbors and had asked if she could borrow a firearm when she arrived from Florida. She also related that she had contacted another neighbor and asked the neighbor to leave because she believed MacDowell was fixated on the person. In addition, MacDowell's mother told Baldridge that there were firearms in the residence and she believed that MacDowell usually carried a firearm.

In response to this call, Baldridge and Sergeant Travis Hayton attempted to perform a welfare check on MacDowell. They went to MacDowell's residence at approximately midnight, knocked on all of the doors, and received no answer. They then contacted a state prosecutor, who advised them to obtain an emergency custody order.[1] They obtained the Emergency Custody Order from a state magistrate and also attempted to obtain a search warrant from the magistrate, but the warrant was denied because they had not alleged any criminal violation.

At approximately 3:00 a.m. on March 5, 2018, after obtaining the Emergency Custody Order, Baldridge, Hayton, and two other officers, Detective Harder and Corporal Harris, went back to MacDowell's residence, but again no one came to the door. They returned to the Sheriff's Office and transferred the

---

[1] See Va. Code Ann. § 37.2-808 (2019 Repl. Vol.) (authorizing magistrate to issue an Emergency Custody Order upon showing of probable cause that a person has a mental illness that likely will cause serious harm in the near future).

Emergency Custody Order to Lieutenant Jonathan Hankins, the incoming day shift supervisor. A little before 6:00 a.m., Hankins made contact with MacDowell via telephone. Hankins told MacDowell that the officers needed to speak with him, and they would come to his residence. MacDowell's response was "very alarming," as if he had been hallucinating. Tr. 62, 66–67, ECF No. 90.

Hankins, Baldridge, Hayton, and Harder returned to the residence at dawn, around 6:30 or 6:45 a.m. Upon arriving, Baldridge and Harder hid behind a truck near the residence to watch from a distance. Hayton and Hankins went up on the front porch of the residence, and Hankins knocked on the front door. Hayton walked to a window approximately 13 feet to the right of the front door and looked through it in an attempt to locate MacDowell in order to better protect the officers' safety. Hayton was able to see into the kitchen, where he saw white powder covering a few inches of a countertop approximately eight to 10 feet from the window. Based on his police experience, Hayton believed that the white powder was cocaine.

Within a matter of moments of the officers' arrival, MacDowell came to the front door and stepped outside. At that time, Hayton walked back from the window to the front door, and he and Hankins handcuffed MacDowell. MacDowell cooperated with the officers and was not violent or aggressive. Hankins searched MacDowell and found a metal pill container, three vials

containing a cloudy liquid substance, and multiple loose pills, some of which had been cut in half, and some of which Hayton could identify as Suboxone, a prescription opioid medication. Based on his training and experience, Hayton thought that the cloudy substance in the vials was dissolved narcotic pills, which he believed indicated illegal drug use by injection of the liquid.[2]

After finding the pills and vials in MacDowell's possession, the officers sought a warrant from a state magistrate to search the residence for "narcotics and paraphernalia." Hr'g, Gov't Ex. 6, ECF No. 86-6. In support of the application for the search warrant, Hayton executed an affidavit that stated as follows:

> On 3/5/18 I responded to 163 Tumbling Creek Road to execute a ECO on Louis McDowell [sic]. Upon the subject exiting the residence to the porch area. [sic] He was detained and searched before being transported. Upon searching the subject several narcotics and paraphernalia were located on the subject. Also upon looking through a window in the kitchen area there was white powder on the counter which is consistent of McDowell [sic] using narcotics.

*Id.* A search warrant was issued pursuant to this affidavit, and upon its execution, the officers discovered material for making pipe bombs. The officers left the house, contacted the State Police Bomb Squad, and obtained additional search

---

[2] An FBI 302 interview form, attached to the government's brief in opposition, states that Hayton also performed a field test of the lid of the metal pill container, which tested positive for the presence of cocaine. Resp. to Mot. to Suppress Ex. 6, ECF No. 82-6. While Hayton testified at the hearing that there was "residue" in the container, Tr. 50, ECF No. 90, he did not testify what the residue was and nothing about it was included in his affidavit for the search warrant. Because no evidence of the field test was introduced at the hearing, I will not accept as a fact that cocaine residue was found on the lid of the pill container. Indeed, I will assume that no evidence of actual cocaine was discovered during the arrest.

warrants, which led to the seizure of explosive devices and the present charges against the defendant.

II.

A.

MacDowell argues that when Hayton looked through the window into the kitchen, he performed a warrantless search in violation of the Fourth Amendment. He further contends that because the affidavit supporting the search warrant that was later issued for the residence was based on information Hayton obtained when he looked through the window, the evidence obtained pursuant to the search warrant must be suppressed. MacDowell argues that the "white powder" observed was crucial to the validity of the search warrant, since without that evidence there is nothing to connect the drugs and paraphernalia found on MacDowell to the house. Def.'s Brief 12, ECF No. 91. In response, the government argues that there was no unconstitutional search when Hayton looked through the kitchen window.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV. Warrantless searches are unreasonable within the meaning of the Fourth Amendment unless they fit into narrow exceptions. *See United States v. Bradshaw*, 490 F.2d 1097, 1100 (4th Cir. 1974). However, "not every observation made by a law enforcement officer —

even if consciously intended to disclose evidence of criminal activity — constitutes a search within the meaning of the Fourth Amendment." *United States v. Taylor*, 90 F.3d 903, 908 (4th Cir. 1996). Thus, when analyzing an alleged Fourth Amendment violation, the threshold question is whether the conduct at issue amounted to a search. *Id.*

"A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "Because individuals ordinarily possess the highest expectation of privacy within the curtilage of their home, that area typically is afforded the most stringent Fourth Amendment protection." *Taylor*, 90 F.3d at 908.[3] However, "law enforcement officers need not shield their eyes when passing by the home on public thoroughfares," and they may approach the home by the front path and knock without a warrant, as this is no more than a private citizen might do. *Florida v. Jardines*, 569 U.S. 1, 7, 8 (2013).

A law enforcement officer's observations of clearly visible activities or objects from such vantage points do not constitute a warrantless search in violation of the Fourth Amendment. *Taylor*, 90 F.3d at 908. For example, in *Taylor*, the Fourth Circuit held that where officers arrived at the defendant's home to return a handgun, approached the house from the driveway and proceeded directly to the

---

[3] I have omitted internal quotation marks, alterations, and citations throughout this opinion unless otherwise indicated.

front door, and saw money and drugs through a window into in a well-lit living room that was clearly visible from both the street, the walkway to the house, and the front porch, the officers had not conducted a search within the meaning of the Fourth Amendment. *Id.* at 909. In that case, the defendant possessed no reasonable expectation of privacy in the dining room or its openly visible contents. *Id.* Likewise, in *United States v. Hersh*, the Ninth Circuit held that where officers without a warrant knocked on the defendant's front door and, when no one came to the door, looked through a window located immediately to the left of the front door and partially covered with a drape, they had not conducted a search within the meaning of the Fourth Amendment. 464 F.2d 228, 229–30 (9th Cir. 1972). In *Hersh*, the officers "were in a place where they had a right to be, and . . . whatever they saw through the window was in plain sight." *Id.* at 230.

Although the facts in this case are similar to those in *Taylor* and *Hersh*, I find that important aspects of those decisions are missing here. Unlike in *Taylor*, MacDowell's kitchen counter was not clearly visible from the street or the steps to the front door. *See United States v. Fuentes*, 800 F. Supp. 2d 1144, 1152–53 (D. Or. 2011) (distinguishing cases in which officers inadvertently observed evidence while approaching a point of entry); *see also United States v. Alicea*, No. CR15-0080, 2015 WL 7460004, at *4 (N.D. Iowa Nov. 24, 2015) (distinguishing a case in which the officers did not deviate from the path that would typically be used to

approach the front door and thus complied with the implied license afforded to all visitors). Unlike in *Hersh*, the window through which Hayton looked was not associated with any point of entry to the home. *See Fuentes*, 800 F. Supp. 2d at 1153 ("[The] cases do not permit an officer to enter the curtilage of a home . . . put his or her face up to a window disconnected from any point of entry, and search the interior simply by asserting that they were attempting to contact the occupant.").

Because Hayton deviated from the path to MacDowell's front door in order to observe things not clearly visible from the street, front door, or other permissible vantage points, I find that a search occurred. *See Jardines*, 569 U.S. at 6 (noting that the right of a person to retreat into his or her home and be free from governmental intrusion "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity" or "enter a man's property to observe his repose from just outside the front window").

B.

Having found that a warrantless search occurred when Hayton looked through a window into the interior of the house from the porch, I turn to MacDowell's next argument — that no exigent circumstances existed to justify this search.

"Exigent circumstances render permissible a warrantless search or seizure, even when there is no probable cause to believe that a crime has been committed." *Figg v. Schroeder*, 312 F.3d 625, 639 (4th Cir. 2002). The exigent circumstances exception to the warrant requirement encompasses officer safety and the destruction of evidence. *Id.* "For police officers successfully to assert the exigent circumstances doctrine, they need only possess a reasonable suspicion that such circumstances exist at the time of the search or seizure in question." *Id.* "[C]ourts should not engage in unreasonable second-guessing of the officers' assessment of the circumstances that they faced." *Id.*

Here, MacDowell concedes that the officers had information indicating a risk of danger to them. However, he argues that when Hayton looked at the kitchen countertop, he conducted a search of the kitchen that exceeded the scope of a search necessary for officer safety. MacDowell contends that "[i]t is hard to believe that the officer scrutinizing the items on the cluttered kitchen countertop had anything to do with officer safety." Def.'s Br. in Supp. Mot. to Suppress 11, ECF No. 91.

I find that exigent circumstances rendered permissible Hayton's looking through the kitchen window to see if MacDowell was in a position dangerous to the officers. The evidence supports a reasonable suspicion on behalf of the officers that circumstances implicating their safety existed. MacDowell's mother had told

the officers that she believed MacDowell was having a psychotic episode, and she was concerned for his safety, as well as her own and that of his neighbors. She had told the officers that she was so concerned that she had asked one neighbor to leave his or her house and had asked another if she could borrow a gun. Further, she had told them that there were firearms in the home, and she believed that MacDowell usually carried a firearm. When Baldridge had been in MacDowell's residence a few months earlier, he had seen firearms and MacDowell had told him that one of them belonged to him. Additionally, when Hankins had spoken with MacDowell on the phone, MacDowell's response indicated that he was not in his right mind.

In light of these facts, the officers had a reasonable suspicion that their safety was threatened, and thus it was permissible for Hayton to look through the window. The fact that the kitchen counter and items on it were directly across from the window and in Hayton's plain view when he looked through the window does not render his actions impermissible.

C.

MacDowell argues that even if exigent circumstances justified Hayton's view through the kitchen widow, the later search of the house pursuant to the search warrant is constitutionally invalid. He relies on three different grounds, which are somewhat tangled together in his brief. Separating them into their proper legal baskets, they are that (1) the affidavit was insufficient to support a

finding of probable cause; (2) even if facially sufficient, the affidavit contained intentionally or recklessly false statements or omissions by Sergeant Hayton; and (3) the resulting search cannot be saved by the good faith exception to the exclusionary rule.

i.

As to the facial sufficiency of the affidavit, MacDowell argues that because the affidavit did not specify what the narcotics were or whether MacDowell had a prescription for them, it lacks evidence that their possession was illegal. He also contends that because the affidavit did not describe the paraphernalia at issue, it gives an incomplete view of the facts. Lastly, he contends that the affidavit's reference to the white powder on the kitchen counter likewise gives an incomplete view of the facts, as the powder could have been flour or other legal substance commonly found in kitchens.

Probable cause exists where, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Probable cause "is a practical, common-sense question that is to be resolved by determining those probabilities based upon the totality-of-the-circumstances presented in each individual case." *United States v. Brown,* No. 90–5738, 1992 WL 46838, at *2 (4th Cir. Feb.12, 1992) (unpublished) (citing *Gates,* 462 U.S. at

230–32). Probable cause is "not a high bar," *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018), and a reviewing court must simply ensure that the magistrate had a "substantial basis" for finding probable cause. *Gates,* 462 U.S. at 238. For purposes of a search warrant, the law enforcement officer does not need to prove that the substances at issue were indeed controlled substances, but merely show that there is a "fair probability" that they are. *See id*. "[P]robable cause, as the Supreme Court has reiterated time and time again, does not require officers to rule out a suspect's innocent explanation for suspicious facts." *United States v. Bosyk*, No. 18-4302, 2019 WL 3483181, at *5 (4th Cir. Aug. 1, 2019). While it is true that an affidavit cannot consist of "wholly conclusory statement[s]," *Gates, 462 U.S.* at 239, the affidavit in this case contained sufficient facts to show probable cause that illegal drugs were present in the house.[4]

ii.

Under *Franks v. Delaware,* 438 U.S. 154 (1978), a defendant may attack a facially sufficient affidavit supporting a search warrant if (1) it contained statements or omissions that were deliberately false or demonstrated a reckless

---

[4] MacDowell's argument that without the observation of white power in the kitchen, the affidavit is insufficient to show that drugs or drug paraphernalia was likely present in the house, is without merit. Drugs and paraphernalia were found on MacDowell immediately after he exited his home, and it was reasonable to thus conclude that more such items might be present in the house, where he was the sole occupant. *See United States v. Kelley,* 772 F.3d 1072, 1080 (7th Cir. 2014) ("Warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site.").

disregard for the truth and (2) those challenged statements or omissions were essential to the magistrate's finding of probable cause. *Id.* at 155–56; *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990). However, this is not an easy task. There is a strong "presumption of validity with respect to the affidavit." *Franks,* 438 U.S. at 171. Additionally, if a defendant claims that the affidavit is unreliable because of an omission rather than a false statement, the burden on the defendant is even higher because the affidavit "cannot be expected to include every piece of information gathered in the course of an investigation." *United States v. Tate,* 524 F.3d 449, 454–55 (4th Cir. 2008). If a hearing is held, the defendant must prove by a preponderance of the evidence that the affiant intentionally or recklessly omitted material facts in order for the court to void the warrant and exclude the evidence it produced. *See id.*

First, there is no evidence that Hayton's decision not to specify the type of narcotics found or whether MacDowell had a prescription for them stemmed from a deliberate falsehood or reckless disregard for the truth. Hayton testified at the evidentiary hearing that he could identify only some of the pills as Suboxone. Additionally, he stated that he could not remember if MacDowell had claimed that he had a prescription for the pills. Given that Hayton knew that at least some of the pills were narcotics, and it is unclear if he knew that MacDowell had a prescription for them, MacDowell has not shown that the omissions were designed

to mislead or made in reckless disregard of whether they would mislead the magistrate. The same is true for Hayton's decision to describe the vials containing cloudy liquid as "paraphernalia" rather than to provide a specific description of them. Hayton testified that although he did not believe that the vials were legally classified as drug paraphernalia under Virginia law, he nonetheless considered them drug paraphernalia because, based on his training and experience, they could be used to inject narcotics.[5] Accordingly, the evidence does not show that his use of the term "paraphernalia" was designed to mislead or made in reckless disregard of whether it would mislead.

Lastly, Hayton did not omit any material facts regarding the white powder. The affidavit stated that he saw white powder on the kitchen countertop, which I find true as a matter of fact. The state magistrate certainly would have been aware

---

[5] In fact, the vials may have been so defined under Virginia law. The statute that prohibits the unauthorized possession of "controlled paraphernalia" includes the definition as "a hypodermic syringe, needle, or *other instrument or implement* or combination thereof adapted for the administration of controlled dangerous substances by hypodermic injections under circumstances that reasonably indicate an intention to use such controlled paraphernalia for purposes of illegally administering any controlled drug." Va. Code Ann. § 54.1-3466(A) (Supp. 2019) (emphasis added). The statute that defines "drug paraphernalia" in relation to prohibiting its sale or possession with intent to sell, includes "all *equipment, products, and materials of any kind* which are either designed for use or which are intended by the person charged . . . for use in . . . injecting . . . into the human body . . . controlled substances. Va. Code Ann. 18.2-265.1 (Supp. 2019) (emphasis added). Moreover, examples include "[c]ontainers and other objects intended for use or designed for use in storing or concealing . . . controlled substances." *Id.* at § 18.2-265.1(10). In any event, it is the intent of the person possessing the paraphernalia that ultimately controls its definition. *See Morrison v. Commonwealth*, 557 S.E.2d 724, 731 (Va. Ct. App. 2002).

that the powder could have been a legal substance commonly found in kitchens, but Hayton went further in his affidavit and connected the powder with McDowell's use of narcotics. In his testimony at the hearing, Hayton agreed that the white powder could have been a substance routinely found in a kitchen, such as flour, Tr. 44, ECF No. 90, but explained that in connection with the drugs and drug-use paraphernalia found on MacDowell, its appearance justified his belief that it was cocaine, *id.*

### iii.

Finally, I find that in any event, the government has shown that the evidence seized should not be suppressed under the good faith exception to the exclusionary rule.

"The fact that a Fourth Amendment violation occurred — *i.e.,* that a search or arrest was unreasonable — does not necessarily mean that the exclusionary rule applies." *Herring v. United States,* 555 U.S. 135, 140 (2009). Even where the circumstances demonstrate that there was no basis to find probable cause, the fruits of a search still should not be suppressed unless "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon,* 468 U.S. 897, 922 n.23 (1984). This good faith exception, as it is commonly called, does not apply in four circumstances: (1) when the magistrate was misled by a knowing or reckless falsity in the affidavit;

(2) when the magistrate abandoned his or her neutral, judicial role; (3) when an "affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is so "facially deficient" that an officer could not "reasonably presume it to be valid." *Id.* at 923.

I have determined that the officers were truthful in their testimony surrounding the information provided to the magistrate and that such information was not misleading or incomplete.[6] I have further determined that the affidavit was facially sufficient to show probable cause. There is no issue as to the sufficiency of the warrant itself, that is, it accurately described the place to be searched and the items subject to the search. Accordingly, I alternatively find that the evidence seized should not be suppressed under the good faith exception to the exclusionary rule.

---

[6] The defendant attacks the credibility of Sergeant Hayton. I agree that his testimony at the hearing was not entirely satisfactory. For example, he could not remember if MacDowell had claimed that the pills found on him had been obtained by prescription. Tr. 53, ECF No. 90. He testified that he had forgotten to save his body cam video of the incident and accordingly it had been automatically erased 30 days following MacDowell's arrest. *Id.* at 47. He testified that he could not remember if he had gone into the house after arresting MacDowell. *Id.* at 52. While he testified that he had looked both over and through the half-curtain inside the kitchen window, *id.* at 42, MacDowell's father introduced the alleged curtain into evidence, Def.'s Ex. 4, ECF No. 86, which was opaque. However, based upon my opportunity to evaluate his testimony, I find Hayton credible. It has been over a year since the events in question, which were otherwise routine and thus a current memory of all of the details would have been unlikely. It should be noted that MacDowell's father agreed that a person standing on the porch outside the window could see the kitchen counter in question from above the curtain. Tr. 93, ECF No. 90.

III.

For the foregoing reasons, it is **ORDERED** that the defendant's Motion to Suppress, ECF No.74, is DENIED.

ENTER: August 19, 2019

/s/  *James P. Jones*
United States District Judge